Ms. Blatt. Thank you, Mr. Chief Justice, and may it please the Court. There are three reasons why Section 340B entities do not have a cause of action to enforce the pharmaceutical pricing agreement between the Secretary and manufacturers. The first reason is that this common law breach of contract suit is indistinguishable from an implied right of action to enforce the statute. A right respondent concedes it does not have. I don't understand that. Private contract is just that. Two parties go into the contract. They set the terms of their deal. No one forced the manufacturers to enter into this deal. So why isn't the issue exactly what the circuit court said? What was the intent of the parties to the contract? You want to make it Congress's intent, but this is a private deal between you. And Congress may have specified some terms to include, but. Yes, and the what is being challenged here is the contractual term that incorporates in Hyke-Verba the manufacturer's ceiling price obligations under the Act. And a third-party beneficiary suit to enforce the contract asserts the same right, seeks the same remedy, and causes all the same disruptions as a right of action to enforce the statute. And another way of saying that is if the case begins with the premise that Congress foreclosed 340B entities from bringing an implied right of action through the front door, Congress did not leave the back door open to essentially the same suit. Sotomayor How do you answer the point that if Congress wanted to make this a pure regulatory statute, it wouldn't have even required a contract? It would have just passed a statute that says anyone who wants to sell to the States or to the 340B entities, you can't charge more than this price. Why do we even need a contract unless inherent with it is some discretion in the agency who is administering it? A discretion that is consistent with normal contract. Right. Well, our position is obviously that the parties had no discretion to confer Article III power on courts to enforce an act of Congress, and this is. But the basic answer is that there has always been a huge difference between the settled rule that parties to a statutory contract are enforceable. They have a cause of action to enforce the contract because Congress spoke with unambiguously clear language that the parties could sue. That's the way statutory contracts must work. They must be enforceable. But your answer sort of is the practical matter. What's the difference? Is this is a, this is a contract, and we do think that the Federal law of contracts and contractual remedies flow between the parties to the contract. It's a bilateral agreement. It's not a regulation. And the Secretary made specific enforceable promises. And there's obviously no even operation of the statutory mandate without the contract. But the reverse, in terms of the long-settled rule that parties must be able to sue to enforce a contract, there's an equally settled rule that beneficiaries under a statute do not have the right to enforce it unless there's a cause of action. Now, the test that I think Respondent advocates and that the Ninth Circuit applied is a test that this Court has long since discarded, which is, well, I'm a beneficiary and this is a good idea and this is sensible. But even if you don't buy our test of you have to imply the implied right of action, these lawsuits are neither sensible nor a good idea and not what Congress intended. And here's why, and it's basically the second and third reason. So no matter how you come at this case and the lens through which you look at this, I think everyone should come out to the same place, which is that neither Congress nor the Secretary nor the manufacturers signed up to what is, in essence, would be over 14,000 lawsuits against 500 manufacturers, challenging the pricing for over 35,000 medications under Medicaid. Sotomayor, your adversary claims you gave up your argument that the contract doesn't make the manufacturers a third-party intended beneficiary. Have you given up that argument? No. I think that the whole thrust of the petition, and obviously the primary argument is that this flouts the implied right of action jurisprudence and it conflicts with congressional intent in all events. But one of the harm in sort of illustrating just how bad the decision was is this conferred rights that the parties never imagined and that the Secretary did not intend. But I think that, in our view, is even if the Secretary had wanted to, it's not the Secretary's decision, nor was it the manufacturer's decision, to go contract by contract and say this multibillion-dollar health care program that incorporates another, even bigger, multibillion-dollar health care program, we're going to turn this over to Federal enforcement, when on the face of the statute reflects a deliberate decision by Congress to withhold. Roberts, private enforcement. Private enforcement. To withhold a private remedy in favor of 340B entities and instead channel exclusive authority to the Secretary to enforce it. And those three specifics, in addition to the disruption, are that Congress gave manufacturers, but not 340B entities, a private reimbursement remedy and a private reimbursement remedy. Roberts, is it — I'm not sure the answer, but is it different in this case or unusual that the agreement is between the Federal government and private entities as opposed to what I think is the more typical situation in which these cases come up, where it's, say, an agreement between the Federal government and the State? Well, all your Medicaid cases, obviously under State plans, and a lot of your implied right-of-action jurisprudence is dealing with Spending Clause legislation as to State entities. But there are a number, a number, the Rehabilitation Act, the Davis-Bacon Act, and a fair number of health care programs where the government contracts with private parties as a public welfare mechanism to get to what I think are conceded are beneficiaries. Here there's a number of beneficiaries. It's not just the 340B entities. It's the patient populations being served and obviously the Federal FISC. So. Ginsburg, would you explain the function that the contract mechanism serves? I mean, you could just have this — you could just have the statute say, Thou shalt not charge more than the ceiling price, period. What is accomplished by having a contract reflecting the terms of the statute? Well, I don't think it's any different than Mobile Oil or Jackson Transit, where you have the terms of the contract and the contract incorporates in hike verba the statutory terms, and if there's a breach of that, there are contractual remedies that flow. But I agree with you that there's not a whole lot difference between our position and the government, because the government is absolutely correct that it's in hike verba and identical, and the statutory obligation that we're talking about that's  But the other sort of practical function is only manufacturers who enter into this contract are subject to these price controls. So if a pharmaceutical manufacturer doesn't want to participate in the program, they're not covered. And in a typical regulation, and I think general sort of spending clause analysis, someone who accepts Federal funding has considered sort of implicit consent to the funding obligations because they're taking the money.  And the contractors, the pharmaceutical companies who signed the agreement. Kennedy, and there was a breach of the agreement, the government assessed penalties? Because, and the reason I'm asking is that you indicate that the government had a contract remedy. It seemed to me it had a regulatory remedy. It's got a lot of remedies. It has, but it's. What was the contract remedy that it had at the time this case arose, which was before the mechanism? Yeah, right. We are still in, today is no different than yesterday, because nothing has happened to implement the 2010 health care reform, except that there are now more civil monetary penalties in there. But the government has statutory penalties, civil monetary penalties, a right of audit, can bring suits under the False Claims Act, and can terminate both this agreement and the Medicaid rebate agreement. But as a, the government has contractual remedies, too. I mean, why Congress, I think, a very sensible inference for why Congress picked contracts is that this is, this piggybacked off the Medicaid rebate program, and that uses contracts. And that instead, that in turn rather used contracts because the States had negotiated rebate agreements with drug companies way before 1990. And so Congress continued the contract feature, and then since the pricing components under this program are the same pricing components under the Medicaid rebate program, both programs are parallel and that both use agreement. One is the Medicaid rebate agreement, and in this case it's the pharmaceutical program. Mr. Blatt, you said that there's not a whole lot of difference between your position and the government's. What is the difference between your position and the government's? Well, the government says a contract is not a contract, even though it says it's a contract. Our position is that this is a contract. It doesn't make much sense, does it? The government sees this, I think, as just a unilateral, that the manufacturers walked in and said, we're here and happy to be bound. But the agreement on its face says the Secretary makes the following agreements, the Secretary promises this. The most important promise the Secretary made to manufacturers is that the Secretary said that she would not terminate the agreement without good cause, 60 days' notice, and certain conduct that the manufacturer did would not constitute grounds for termination. Scalia, what did the manufacturer promise in exchange for a contract? You do need consideration. What did they promise that they weren't already obliged to do by law? Well, the billions and billions in price discounts, they were not obliged to do unless they signed the contract. But the contract goes through a ton of manufacturer responsibilities. The manufacturer, if the Secretary thinks that there is reimbursement that's owed, the Secretary can order reimbursement. And the manufacturers has – it's a pretty substantial amount. So what is Santa Clara County supposed to do? They think they're being overcharged. And in your opinion, the company doesn't, but they do. So what are they supposed to do if they're right? How do they get the money? Well, the way they have been getting the money, and for better or worse, until 2010, they have been at the mercy of the vastly larger Medicaid rebate program, which is run on behalf of the States. And because this program is so small compared to that program, all the enforcement activity, which is all the False Claims Act settlements that Respondent cites in his brief, that's how, as a practical matter, it's been enforced. No, no, but I'm interested in procedurally, what are they supposed to do? Oh, pick up the phone and either call the manufacturer, the prime deliverer. Oh, the manufacturer says, okay, you're wrong, I'm not, I'm undercharged, now what happens? Ultimately, if they can't get the Secretary to – He's busy. If she's busy and won't return the calls, Congress said you can't enforce it. Why can't they, for example, file a claim with the Secretary and say, we would like the Secretary to order them to give us the money? They're violating this. They go to an administrative law judge. Is there an administrative remedy of some kind that would be reviewable in the courts for reasonableness? There's just – right now, there's just an informal, non-mandatory. Okay. So why is it reasonable, then, to think that the Secretary would have entered into a contract which is going to benefit them and there's no remedy? Because the statute itself said, we're going to go out of our way to give manufacturers remedies, make this confidential, manufacturers have rights of audit, but 340B entities don't. The Secretary hears a vast arsenal of things at your disposal and it's channeled through that regulatory regime. But normally under the law, from Marbury v. Madison onward, where there's a wrong, there's a remedy. And the remedy could be administrative, could be judicial, et cetera. But you're saying there's none. No. I think 30 years have said that we're not going down that road. I mean, in Gonzaga, there was a breach of the statutory provision and students presumably are harmed when private information gets disclosed.  But there very often is an administrative remedy. That's true. And a person always, any individual in the United States can go ask any agency to do anything. And there is even review in instances of refusal to withhold, a withholding of action. There's always an APA action against the Secretary. Is there here? You just said there was. Well, I think it would be hard to bring an APA action. What about a False Claims Act action? Yes. And False Claims Act are brought. There's a lot of them and there's a multitude of settlements that are outlined in the brief. And to the extent that you're objecting to the disruption of the Secretary, there is disruption when it's a private party bringing a False Claims Act. Well, it's not a private party. It's a private party who's assigned the claim. I mean, the case is brought in the name of and it is a case by the United States. And that's significant because the United States has complete and total control over that case. Here the problem, it's bad enough. Even if the United States doesn't take over the case, this lets the Q-10-related proceed. Right. Yes, that's right. It's still brought in the name of the United States with heightened pleading requirements and they actually have to allege a knowing false statement. You emphasize that the contract has the language in high verba of the statute. What if it doesn't? The statute imposes certain provisions. The pricing, I guess, is the key one. But in a private deal, when you're arranging for the delivery of, you know, pharmaceuticals, you could have a lot of provisions. It's got to be delivered by this much. You've got to have this much inventory. You've got to do whatever. I mean, what if the contract here included terms beyond those in the statute? Could those be enforced by the third party beneficiary? Yes. And there's. Yes. If it's not in enforcement of the statute, only if, and I think it's significant that plaintiffs always lose under a third party beneficiary because the bar is so high. The government always enters into contracts on behalf of somebody and the government rarely intends to confer enforceable rights and the parties rarely do it. But if you had an express provision outside the statute that said we intend to confer enforceable rights on third parties and it's not in enforcement of the statute at all, then all your jurisprudence for determining congressional intent aren't being subverted and aren't being undermined. I could give you an example. I mean, it could be anywhere from something just completely outside the statute together. The pharmaceutical companies could say we hereby agree to make a contribution every year to the clinic or hospital for a holiday gift. That would be an odd contract. I don't see the Secretary entering into third party beneficiary contracts. A much more efficient way would just be to contract with the entity itself. But I think this is just another way of saying that a lot of the energy and breadth in the court of appeals would be saved in going through why the common law doesn't confer it, because congressional intent by and large is going to line up with the Secretary of the Party's intent. But when you're talking in hype verba, and this could not be more precise because it's the exact – it's actually not even 340B, the allegation is it's a violation of the Medicaid Rebate Act pricing reporting requirements, its congressional intent is all that matters. Scalia. Is this a contract with the Secretary or a contract with the United States executed on behalf of the United States by the Secretary? It's a contract executed by HRSA, the administrator of an agency within, and he or she, whoever the administrator is at the time, enters it on behalf of the Secretary. So the contract is in the name of the Secretary. It's in the name of the Secretary. It says – I mean, it's in the PEDAP starting at around 169. It says the Secretary. And you don't have the signature page, but I've seen them. They're all signed by the administrator of HRSA, which is the organization within HHS, not CMS, but HHS, that runs the 340B program. But if I could – actually, I'll just save the remainder. Thank you, counsel. Ms. Anders. Mr. Chief Justice, and may it please the Court. The Pharmaceutical Pricing Agreement should not be construed to permit 340B entities to bring suit to enforce drug manufacturers' price reporting requirements for two reasons. First, the PPA is not an ordinary contract, and it does not transform the 340B program from a regulatory scheme into a contractual one. Like a Medicare provider. Is it a contract at all? It's not an ordinary contract in that it doesn't give rise to contract rights in the regulated entities. This is very similar to Medicare provider agreements in which a health care provider who wants to enter into the Medicare program and provide services agrees, signs an agreement in which he agrees to abide by the statutes and regulations set forth in the Medicare program. And in return for that agreement, he's given the opportunity to participate in the Medicaid – in the Medicare program. But how do we distinguish between a – what you call an ordinary contract and this sort of a contract, if it's any kind of a contract? Well, I think when the statute directs an agency to enter into an agreement for the sole purpose of memorializing the party's opt-in to the regulatory scheme and directs what the terms shall be, so here provides statutorily what the reporting requirements will be, that's when the contract is a regulatory mechanism. Sotomayor, are you telling me you're taking – then you're right, then your co-counsel was right, you're agreeing with her totally. If Congress wrote the statute, said these are the terms we want to give you in a contract, you figure out how to implement and enforce this. The Secretary says, I don't have the resources to enforce this. I'm going to write a contract that gives the 340B entities a private cause of action. Manufacturers can take it or leave it. You're taking the position that the Secretary is without authority to do this? I think it would be a difficult question. I think it would be a difficult argument to say that the Secretary was completely without authority. I think what has happened here is the Secretary has reasonably interpreted the statute in providing for an agreement between the Secretary and the manufacturers to simply mark the option. Well, that begs the question that Justice Alito asked you, which is, if we go your route, which is, is this a regulatory or some sort of other contract, how do we get to the point where we can tell the difference, and do we need to go that far? Isn't your position, I thought half of your other half of your position was that this is not a third-party intended beneficiary? All the terms of the contract are between the manufacturer and the Secretary and the obligations to the Secretary, not the obligations to the third parties. That's exactly right. I think to take the first part of your question, I think the Court can tell when this is a regulatory contract, when the statute itself simply directs the agency to enter into an agreement that contains the terms that are set forth in the statute. And when you look at the statutory scheme as a whole, it is a regulatory scheme. The government is not acting as a contracting party here. It's acting as a regulator. It has the authority to impose administrative penalties, which would be reviewed under the APA. There's no transaction that's taking place with the government. The only rules governing the conduct are statutory. So that's why we think you can tell that this is not an ordinary contract. It's a regulatory contract, but you mean there's no negotiated element to it. It's what the statute – it's the same as Ms. Blatt said. It's the contract repeats the words, the terms of the statute, and that's it. Is that what you mean? That's right. This isn't a negotiated agreement. The Secretary has simply repeated the terms of the statute in the agreement. That's exactly right. Roberts, you could do this, I guess, by regulation, right? I think that would be one way. Just your regulation saying manufacturers who participate in this program agree to do, you know, whatever your contract says. I think that would be one way to do it, yes. And throughout this area, though, Congress has often used agreements to mark entry into the regulatory scheme, including in the Medicare provider area, where you do have these agreements with health care providers. But it would be very odd, then, to say that the entire area is regulated by breach of contract law, rather than by the hundreds of pages of regulations and statutory provisions that govern the provider's rights there. Could you tell us whether you agree with the Petitioner's argument in Part D of its brief that private suits would seriously disrupt the comprehensive statutory scheme, in light of the position that the government has taken in other litigation involving actions brought by States, in-rate pharmaceutical industry, average wholesale price litigation in the District of Massachusetts? We do agree with the Petitioner's that permitting third-party beneficiary suits here, if you construe this as a contract, would interfere with the government's ability to administer the statutory scheme. This is a national pricing scheme that's put together by the Medicaid Rebate Act, which has — which is heavily regulated, allowing 14,000 covered entities to bring in individual suits in different courts without HHS consultation, without the benefit of the government's input, could lead to substantial disuniformity, despite the fact that these are supposed to be national pricing. Sotomayor, you're walking away from your position in the District of Massachusetts. The States do not have, according to you, the right to enforce the rebate program? No, that's actually an important point. I think in the Medicaid context, the States have a cooperative relationship with the Federal government, and so they receive some of these funds directly, and they have — in fact, in the Medicaid Act, it is contemplated that they have their own enforcement responsibilities. So when States bring State law fraud suits, State law FCA suits, they actually — they consult intensively with HHS. And so in that respect, those suits represent the government's — An implied cause of action? Is that what you're saying those State suits are? Those are actually State lawsuits that were involved in the — in the average wholesale price. Sotomayor, is that regulatory scheme any different than the one inviting — involving the PPA? Well, the Medicaid Act itself gives States an enforcement responsibility and says that they are to use their efforts to find fraud and prosecute it. And so States actually have a whole body of State law, State law fraud claims. Suppose that the State of California says we'd like our counties to be able to enforce this. Then what happens? Under the Medicaid Act, there would be a suit. Well, I suppose the California — if the California wants to say we could bring this suit like Massachusetts did, you agree, they could. And then they say, all right, well, we don't have the time. We want the counties to do it. Couldn't they do that? Well, we think it's very different when you have covered entities. Well, what's the difference between a State doing it itself through its attorney general and the State saying we'd like the county to do it through its county attorney? Well, there's consultation with the Federal Government at the front end when the State brings a suit. And so the Government has a chance to coordinate, to avoid disuniformity. But when you have covered entities, you know, thousands of them potentially bringing a suit. Well, if California comes to you tomorrow and says, the attorney general says, you know, this is a problem, you don't have time to enforce this, there should be some enforcement, and we want to enforce it, and moreover, we'd like each county affected to enforce it, do you have the authority to enforce it? Is there any reason you wouldn't say, go ahead? Well, in that sort of situation, you might be able to have a State law fraud suit. I'm trying to analogize it to the Massachusetts one. You say they can just go ahead and do it, and they say, you know, Santa Clara County is just as big as Rhode Island. And you say the AG of Rhode Island can bring the suit. Am I right? And so why can't the low ‑‑ why can't Santa Clara do it? Well, in the covered entity context, the concern is that because you have so many of them, if you start permitting covered entities to bring suit, this is essentially a preemption question, but you then have 50 different States regimes, State court regimes put on to ‑‑ grafted on to the Medicaid rebate requirements. This is supposed to be a uniform pricing scheme. And so once the requirements become disuniform, it becomes very difficult for HHS to administer the scheme in the way that it's supposed to. I think it's also important to point out that the recently enacted Affordable Care Act will provide the exclusive administrative remedy for claims exactly like Respondent, once HHS puts that into effect. So Congress, in looking at the scheme, to the extent it had concerns about enforcement by covered entities, the way it reacted was not to create a private right of action or provide for breach of contract enforcement, but was simply to give the agency enhanced authority in order to adjudicate the claim for itself. Roberts. Roberts. It identified the problem that individual beneficiaries did not have a remedy, or that courts had indicated that they didn't and they thought there should be a remedy? There were ‑‑ there were OIG reports raising concerns with oversight and enforcement at a general level, and the way Congress reacted to that was to put in place this administrative remedy, which will allow covered entities to bring these claims and will allow HHS to have the first opportunity to determine the meaning of the AMP and best price requirement. Ginsburg. Ms. Black said nothing has been done. It just went into effect on January 1st. But are there plans to implement it? Yes. The agency is moving ahead with that. The agency has already issued an advance notice of proposed rulemaking back in the fall, and it solicited comments about how the administrative scheme should look. That comment period has closed, and so now the agency is in the process of moving forward with the regulatory process. Sotomayor. So I understand your position clearly. In a regulatory contract situation like this one, the Secretary is without authority to decide he or she can't enforce the statute and to confer expressly by contract third-party beneficiary rights to the people receiving the benefit. That's the position you're taking. If the Secretary had written the provision into this contract telling 340B entities you can sue, that would have been, according to you, ultra-virus. I think it would be difficult to say that the agency would have been totally without authority to do that. It's not a question you have to answer here, because I think the PPA clearly shouldn't be construed to confer third-party beneficiary rights, because that would be inconsistent with the statutory scheme. Thank you, counsel. Mr. Frederick. Thank you, Mr. Chief Justice. I'd like to start with Ms. Blatt's answer to your question about whether a provision of the agreement here could confer third-party beneficiary rights. She said yes, so long as the wording wasn't specifically prescribed by Congress. In so doing, she concedes that this is a contract, that normal rules of contract law apply, that the fact that the Secretary has entered into the contract is of no moment, and that third-party beneficiary rights are an inherent part of normal contract principles. So now we're left with the question, does it matter that Congress wrote the particular words that the Secretary used in the agreement? Please submit the answer is no. Third-party beneficiary rights are part of normal contracts, but the third-party beneficiary has rights under the normal contract only when the parties intend him to have rights. It's not that every contract which has a benefit for some person allows that person  There has to be an intent. And I have trouble finding that intent here, either on the part of the Secretary or would the Secretary have had that intent when Congress clearly did not have the intent to allow private individuals to sue? Justice Scalia, you find the intent in Part 2A of the agreement, which is set forth in the Petition Appendix. And in Part 2A, the manufacturer who agrees voluntarily to enter into this agreement agrees that the entity, that the entity will be charged only a set ceiling price. That is a voluntary agreement of a duty by the manufacturer that runs to the third-party beneficiary-covered entities who are specified in the agreement. Scalia, but you didn't hear my question. My question was the mere fact that there's a duty to a third party in the normal contract does not give that third party the right to sue, only if the contracting parties intend the third-party beneficiary to have a right to sue. Well, that's not the standard, Justice Scalia. The standard for a third-party beneficiary, as set forth in the restatement and as recognized by this Court, is whether or not the parties objectively intended to create intended third-party beneficiaries whose right to bring the suit would enforce the contract. And that's precisely what we have here. Ginsburg, in this case, went back to the district court. The agency's position was, this is a total surprise to us, 14,000 suits or whatever it is. No, we never, we never envisioned making the individual, whatever you call them, the 3OB. The 340B entities. We never envisioned making them the beneficiaries and allowing them to sue. That would be quite disruptive of our program. That's, I thought, was the position the government took. The government cannot argue for subjective intent of an agreement written 18 years ago. This Court's decisions in contract have always held that the objective intent as expressed by the words of the contract are what courts are to construe. Kennedy, I don't understand why what Justice Scalia said isn't the same as what you said. You said, no, Justice Scalia, restatement of contract. But what he said, the question is whether or not did the parties intend, and it's an objective intent, to confer these rights on a third person. And you said, no, no, that's not it. But then it seemed to me that your answer that you gave was just what Justice Scalia said. I missed something. Okay. Here's what I think I misunderstood, perhaps, from Justice Scalia's question. For third-party beneficiary rights to create an enforceable breach of contract claim, the parties to the contract do not have to have a provision in the contract saying, and therefore, the intended third parties get to bring a breach of contract claim. That's never been the accepted law. The law has always said if the parties intend to create third-party beneficiaries and bringing of that suit to enforce the contract would be within the objective intent of the parties, such a suit is permissible. Now, I want to caution that what is different about this suit from the kinds of implied rights of action suits that the drug companies here claim to be so disruptive is that all we're arguing for is the bargain that the manufacturers agreed to undertake. That bargain was the discount. It's the delta between what the counties paid and what they should have paid under the discount program sealing price arrangement in the plain terms of the agreement. Third-party beneficiary rights. Alito, I'm sorry. Alito, could there be a third-party suit by an intended beneficiary, and a purported intended beneficiary, if it is clear that Congress intended to the extent it can intend something for those beneficiaries to get the benefit of the price, but did not intend for them to be able to sue? Yes. I think indirectly here, Justice Alito, that the patients here certainly are incidental beneficiaries insofar as those who can't afford to pay for the drugs, get them for free at the county's expense. This is county money that we're talking about here. Or if they have some limited insurance, they're able to get the drugs at a discount. So they are certainly incidental beneficiaries. But because they are not named, and because the intent of the program is to provide the 340B entities with discounted drugs so they can extend scarce dollars farther, they have no right to sue. If there were a provision in the law saying expressly there is no private right of action under this statute, would you be able to make the same argument? No. Our argument rests on the silence of the contract with respect to how enforcement would occur. It's long been the case, though, that where the parties intend to displace a third party beneficiary's rights, the objective intent of the agreement is what is considered understood. Sotomayor, I'm sorry. I don't understand the distinction that you're ignoring in the law. I thought it was very clear that proof that you merely received the benefit by a contract is not proof that the parties intended to confer on you an enforceable right. Is that correct? Is that the statement of the common law? That is how the restatement frames it. It is a difficult line, I think, sometimes, to understand the difference between an intended beneficiary and an incidental beneficiary. Certainly the manufacturers here are incidental beneficiaries because they have access to this market. Sotomayor, no matter how you want to draw this line, if the issue is what's the objective intent about enforceability, if I look at the PPA, it makes the manufacturer's obligation one way to the government to provide the pricing information. It gives only the government the right to institute the informal dispute resolution system that the contract specifies. This is not the new law. This is the PPA as it existed at the time. It gives only the Secretary other enforcement rights. What am I missing? Where in the contract is there one provision, one sentence, one anything that requires the manufacturers, other than the price benefit, to do something that could be characterized as enforcement? But that is the key, Justice Sotomayor. The price discount is where all the action is in this program. These prices between 1990 and 1992 were being raised by the drug manufacturers as against these entities. And the whole point of Congress enacting this statute was to confer the same discounted drug program to the covered entities as had been done through contracts to the State Medicaid rebate program. And that's why the provision in the amendment — sorry, in the agreement that says thou shalt not charge the covered entities more than the ceiling price is exactly where you find the intended third-party beneficiary rights, because that's their money that's being spent. It's not Federal. Breyer. Breyer. I was thinking maximum resale price maintenance. The distributor and the manufacturer agree on the maximum resale price. Pretty unlikely that they intend the consumers who are intended to benefit to be able to have a lawsuit. Then I think, well, gee, I don't know. And what the government is arguing is, sure, the point you made favors you. But they say there are two major points here that favor them about background. I want you to hear what your reply is. One of them is Congress, in the statute that is incorporated here, didn't want a private person to be able to enforce it. And the second one is it's going to create a mess. All right. So they say those are two background features here that favor them. So what's your response? Number one, there's no evidence that Congress intended there to be a departure from normal operating contract principles. And this Court in Winstar, in Mobile Oil, in Jackson Transit, in Central Airlines all said that when Congress uses contracts or agreements, it intends to incorporate the full cluster of the common law rights as they've existed. And third-party beneficiary rights have been recognized for 350 years, even before the founding of this Republic. Now, as to the disruption, I think it's a canard, because what we're talking about here is one price that would govern all 14,500 covered entities. So if Santa Clara gets the discount price for Lipitor, say, that is the best price, and it will be charged and chargeable to all of the 340B entities across the nation. So in terms of administrability, one suit actually can solve the deficiencies in the government enforcement program, and the government can participate in this suit. Well, which way does that cut? That seems to me to put an awful lot of power and authority in the hands of one beneficiary and one lawyer, saying all they have to do is file a suit saying, look, we get 100 doses of Lipitor from this program, we think we should get less, and if they win, the whole country's pricing of Lipitor under this program is changed. That strikes me as an argument in favor of leaving the enforcement with the Secretary. No, I think it's an argument that may misunderstand some of the benefits that class action practice can provide, where there is a uniform way of analyzing the problem, because these prices, Mr. Chief Justice. It doesn't have to be a class action, does it? Well, it doesn't. This was brought as one for the efficiency purpose of attaining exactly the effect that you are identifying, which is that if it is more efficient. But that's why it was brought as a class action. Well, it was brought as a class action because the county of Santa Clara stands in exactly the same position as the other 57 counties of California and the other counties in the United States, who are overpaying for drugs that the manufacturers are paying for. Breyer's what do you think about? I'm not sure I'm right at all here, but as I understand the development of this argument today, it's open to you and the other 57 counties to go to the State AG and you say, you bring the lawsuit, okay, or make us a, make me a, the lawyer says, make me an assistant AG for this purpose, and I launch the lawsuit in the name of California, and then I can get the same place. What do you think of that? I don't know that the State, because these are entities that are not defined in the agreement, the, this is a different agreement than under the Medicaid rebate agreement, which is set forth in the joint appendix, where the States are the third-party beneficiaries of those agreements. I'm not sure that the State actually has standing to bring these particular claims. That is not something that has been tested. But what I would say is that if you reject our argument here, you are substantially undercutting the ability of the States to bring the same kinds of overcharging claims against drug manufacturers under the Medicaid rebate program. That's what the State's amicus brief here makes clear. The SG has a very fuzzy footnote at the very end of the government's brief that does not set forth a clear standard that differentiates why 340B entities' third-party beneficiary rights are any different from States' rights under the Medicaid rebate program. Ginsburg. I thought it was because the States had been given a role in the statute itself where the 340B entities have not. I thought that was the government's position, that the States have a role in the Medicaid rebate program, and that's an entirely different thing than this program, where these entities have no statutory role. There's the drug manufacturers and there is the HHS. Justice Ginsburg, I don't think that was the basis for Judge Saras's opinion in the District of Massachusetts, which looked at the third-party beneficiary theory of the Medicaid rebate program a place at the table in bringing these kinds of claims. And to the extent that that analysis bears out anything, it tends to cast doubt on the government's theory that these are somehow regulatory contracts that suggest a blurring of the normal lines between regulation and contract. That theory, the regulatory contract theory, has been rejected by this Court in Winstar and in Mobile Oil, where the government tried to argue that because it was implementing regulatory policy through contracts, somehow normal contract principles don't apply. And this Court rejected it. Scalia. But the government's footnote doesn't rely on the contract. It says that — and it wasn't purporting to say the basis that the Court applied in the District of Massachusetts case, but it was explaining why in the government's view it's a different situation. And what it said, it's a different situation, not because of a different contract, but because in that other situation, Medicaid — the Medicaid rebate — Medicaid generally is, quote, a cooperative Federal-State program. I mean, their point is that the States are explicitly given authority for enforcement in Medicaid. And here, the entities you're representing are not. Justice Scalia, and that is why resort to the normal canons of construction that this Court has long applied to government contracts is what is most pertinent here. The government, I don't think, can point to a specific provision of the cooperative Federalism that empowers States to engage in any greater enforcement power than a normal third-party beneficiary under this Court's normal cases. And back to Central Airlines and American Surety, which 100 years ago recognized a third-party beneficiary's right to bring suit on a breach of contract, and held that the absence of a specific enforcement power in the statute was not enough to deny the normal operation of law for the breached party to sue for that breach. That's common in the law. Scalia, the only difference, it seems to me, Mr. Frederick, is that the States are sovereign. They can enforce their own laws. The entities at issue here are not sovereign. They're not enforcing their own laws. They are trying to enforce Federal law. But under the Medicaid program, the States, using their own fraud actions, whatever else, have a role to play. Well, Justice Scalia, I think if you took that argument to its logical extreme, you would have come to a different answer in the Arthur Anderson case, where there you recognized a third-party beneficiary's right to invoke a statute to get an arbitration agreement upheld. And I think you would have come to a different result in the Murie v. DeKalb County case, in which the Court said that just because there is an FAA contract with a local if there is an adverse effect on adjoining land, because you would have said that because the adjoining landowner had no specific enforcement authority, that person or entity would be out of luck. I think this Court's rules are different. Roberts, that's 1977, and a lot of your argument, it seems to me, is in the earlier world of implied right of action jurisprudence that has changed dramatically in the last 30 years. And what concerns me is when you are talking about the same language, the mere fact that the government has decided to go through a contractual mechanism to advance this program doesn't allow you to use that to get an end run around all of the implied right of action jurisprudence of the last 30 years. You're on stronger ground before that. Well, let me address that directly, Mr. Chief Justice, because Justice Rehnquist, who is not any fan of implied rights of action, was the author for the Court's opinion in the Murray decision. And that was pretty well established. That analysis was certainly consistent with the established jurisprudence in this area then. But it started changing very quickly thereafter, I think about 1980, and then consistently went in the other direction to the point now where I think the jurisprudence is pretty clear that we're not going to imply a private right of action at all. We are not asking you to imply a private right of action, Mr. Chief Justice. We're asking you to honor contract principles that you call out. Ginsburg. The result is the same, Mr. Frederick, and that's the central point of Ms. Blatt's brief. Call it whatever you want. It's the Congress has not provided for a private right of action to enforce the terms of the statute. The contract embodies the terms of the statute. So it would be passing strange if Congress, as we now read Congress, says we want private parties out of this, this is to be between the agency and the manufacturers, to say the same exact result, the same aim, can be achieved through this third-party beneficiary route. And I think that is the one that stands out about this case. And so how do you respond to that? What's the difference between suing because the statute has been violated and suing because the contract has been violated? Frederick, a contract is a voluntary agreement entered into between the drug manufacturer and the secretary. The manufacturer can choose not to participate. So in every one of the implied right of action cases that you've dealt with, an outside entity has been forced to comply with a statute or law. But the statute wouldn't apply to someone who doesn't want to be in the program? But, Justice Ginsburg, those cases all involve the imposition of duties on the part of an entity or actor out in society. Here we're talking about voluntary action. The drug manufacturers can decide not to participate and not sign the agreement. And they have the right, under the provisions allowing termination, to terminate the agreement at will with no reason whatsoever. Roberts, it's the same situation with the States under Spending Clause legislation. They don't have to sign up, but if they do, then the issue is, is there an implied right of action on the beneficiaries? And our cases for the last 25, 30 years have said no. But the remedy is different, Mr. Chief Justice, and that is a key difference. All we're talking about here as a remedy is the difference between what they promised to charge and what they actually charged. The remedy is different. But we're told that whatever you say, that's all we're talking about. We are told that computing the price is a very intricate business, and many of these disputes have been about what is, what should the ceiling price be? So it's not just that the ceiling price is out there and there's no dispute about it, it's just a question of getting the manufacturer to charge that price and not a higher price. The question is, what is the ceiling price? And there are two ways to calculate it. Under the more complicated formula that is designed to enhance the profits of the drug companies, it is a more complicated endeavor. All of these cases, Justice Ginsburg, all of them have been with the simple formula, which is, has the drug company given its best price to some other purchaser in the market? That's where the False Claims Act cases that they acknowledge do not create such an intrusion into the program that somehow they can't be brought. Ginsburg. But that's because they said they have control over them, and they don't have control over these suits. Well, no, the difference in a QUITAM case, as your question earlier to my colleague acknowledged, Justice Ginsburg, is the government doesn't have to intervene in a False Claims Act case. What's different there is that there has to be some inside whistleblower who can pass through the very difficult hurdles of a False Claims Act case, whereas here we're talking about benefit of the bargain. The manufacturers agreed by contract they were only going to charge a ceiling price, and we assert, based on, you know, quite extensive reports by officers of Inspector General, that they have not been charging that price. They've been charging in excess of that price. And all we're asking for is the delta. And the government, in its Massachusetts submissions, has acknowledged that this type of best-price litigation is not so complicated, because all one needs to do is figure out, did the drug company sell the particular drug to some other entity for a lower price, and if that's so, that's the price you apply across the board to all the 340B entities. The argument about distraction and intrusion, Justice Ginsburg, I would respectfully submit is a gross overstatement of what actually happens in this type of litigation. And to the extent that there are complexities, the complexities are introduced by the drug companies for the sole purpose of masking what price they are charging to the 340B entities, because all these various mechanisms, the bundling of drugs, the use of kickbacks and payments to purchasers, are all designed to mask what the true price of the drug is. And if Congress intended anything in the program, and in getting the Secretary to implement this program through statutes, it was that the 340B entities who are providing drugs and medical service to the poorest of our citizens should be entitled to the benefits of the collective market created by these 340B drug purchases. And that's all that we're asking for here. Ginsburg. Do you take the position that nothing has changed as a result of the new legislation? That is, Ms. Anders told us that this statute is going to just become effective, that there's going to be procedures, better procedures than there were before. Is there still this third-party beneficiary suit despite the possibility of going to the agency? We don't know, Justice Ginsburg, is the simple and plainest answer I can give you. And the reason we don't know is because the Secretary has already missed the first statutory deadline for issuing implementing regulations. There was no statement of rules in the notice of proposed rulemaking, as is ordinarily the case for agencies. The Secretary simply put out for comment that we are going to develop procedures and rules. So we don't know whether or not the Secretary will express some further intent as to how these new rules are to apply. But I would submit that this Court's cases are very clear that a later enactment of Congress is not intent of what an earlier Congress has stated, and the absence of any specific remedial provision coupled with the use of agreements carries with it the ordinary presumption that Congress intended for that cluster of common law rights to be associated with the agreement. And that's certainly been the way this Court has enforced contracts involving the government itself. If there are no further questions, we'll submit. Roberts. Thank you, Mr. Frederick. Ms. Blatt, you have three minutes remaining. Blatt. If I could just talk about the drug companies, Lipitor, and the common law. And if you want, I can also talk about States. We take, obviously, deep umbrage at the suggestion that the drug companies are somehow against these clinics. Any Internet search will show you that the amount of discounts given under this program equals the amount of free drugs that are given to these same clinics. And it also, probably even a better response, is you can look at any rebate release issued by the Secretary of HHS or any page of their CFR, and if you think it's simple, I would be shocked. On Lipitor, it's not the case that the Central District of California decides nationwide what the price of Lipitor is. Under the other side's view, the Southern District of Texas, the Northern District of New York, and the District in Alabama would all decide. And what's really bad, it is bad enough for them to have 14,000 suits over 35,000 drugs. But what he's talking about, best price and average manufacturer price, that determines the State rebate program, because the rebate program is a rebate and the ceiling price program is a ceiling price, when one of the pricing components goes up, that's average manufacturer price, the States benefit, they get more money. But generally, 340B entities, their ceiling price goes up. So what's good for the 340B company, or entity, is bad for the States. And that's not disputed. He just says it's hypothetical. But he's asked for millions and millions and millions and millions and more millions of transactions that go to that very pricing component. Common law. On pages 9 to 11a of the Petition Appendix is a good three or four citations to the third-party beneficiary Federal common law, and the courts go out of their way to say it's not enough to be a direct beneficiary. The analysis is exactly the same under implied right of action. Is there clear and unambiguous intent to confer enforceable rights? It's the same. We just think because it's in hype verba with the statute, it's congressional intent that's controlling, not the parties. I can talk about States if you want. Otherwise, I'm happy to just ask for the decision to be reversed. All right? Then we would ask that the decision be reversed. Roberts. Roberts. Thank you, counsel. Counsel, the case is submitted.